IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

**ALEC DAVID BARNETT, JR.,** *et al,*    )
                                        )
     **Plaintiffs,**                     )
                                        )
**v.**                                  )    **Civil Action No. 13-0470-KD-M**
                                        )
**BALDWIN COUNTY BOARD OF**              )
**EDUCATION,** *et al.,*                 )
                                        )
     **Defendants.**                     )

## ORDER

This action is before the Court on the motion for summary judgment filed by Defendants Baldwin County Board of Education, Dr. Alan T. Lee, Norman Moore, Robert Callahan, Jr., David Cox, David Tarwater, Elmer McDaniel, Angie Swiger, Shannon Cauley, and Lee Mansell, narrative statement of undisputed facts, brief, and evidentiary submissions (docs. 60, 60-1, 61, 62, 62-1 through 62-8), the response filed by plaintiff Lenka Lampkin as parent and next friend of R.L., a minor (doc. 67), and the defendants' reply (doc. 75).  Upon consideration, and for the reasons set forth herein, the motion is GRANTED in favor of all Defendants.[1] [2]

I. Procedural History

In September 2013, plaintiffs Alec David Barnett, Jr. as parent and next friend of R.P., a minor; Sidney Pennington as parent and next friend of D.P., a minor; Lenora Chapman as parent

---

[1]  Defendants move to strike Lampkin's response and brief in support on basis that Lampkin gave false and misleading information to the Court and Defendants in order to obtain a three-day extension. (Doc. 68) Lampkin did not respond to this motion.   The motion to strike is DENIED.

[2]  Defendants move to strike the three affidavits filed in support of Lampkin's response. (Docs. 70-1, 70-2, 70-3, 72, 73, 74).  As explained *infra,* the Court did not rely upon the statements contained in these affidavits, the motions to strike are MOOT.  Plaintiff's motion for extension of time to respond to the motion to strike (doc. 81) is MOOT.  Defendants' motion to strike Plaintiff's response to the motion to strike (doc. 83) is MOOT.

and next friend of D.C., a minor; Renee Williams as parent and next friend of A.W., a minor; Andre Stephenson as parent and next friend of L.S., a minor; Isabelle Martinez as parent and next friend of C.M., a minor; and Lenka Lampkin as parent and next friend of R.L., a minor, filed suit against Defendants Baldwin County Board of Education; Superintendent Alan T. Lee; Board President Norman Moore; Board Vice President Robert Callahan, Jr.; Board Members David Cox, David Tarwater, Elmer McDaniel, Angie Swiger, and Shannon Cauley; Principal Lee Mansell and Principal Chuck Anderson. (Doc. 1)

Defendants filed a motion for judgment on the pleadings, which was granted in part and denied in part. (Doc. 38) As a result, certain claims of Barnett, Pennington, Williams, Stephenson, and Martinez were dismissed for failure to exhaust their administrative remedies under the Individuals with Disabilities Education (IDEA) and the Court declined jurisdiction over their state law tort claims. They were dismissed from the action.

Defendant Anderson was dismissed from this action. He was the principal at Central Baldwin Middle School.  The claims brought on behalf of A.W., the student who attended his school,were dismissed for failure to exhaust the administrative remedies under the IDEA, and the Court declined jurisdiction over the state law tort claims.

The remaining plaintiffs, Chapman and Lampkin, were ordered to file an amended complaint.  Ultimately, their fourth amended complaint was allowed by the Court and became the operative complaint in this action. (Doc. 51)  Chapman's claims were dismissed for failure to prosecute and failure to comply with the Court's orders. (Doc. 59)  The remaining Defendants have now filed their motion for summary judgment as to the claims of the remaining plaintiff Lampkin, that are raised on behalf of her minor child, R.L.in Counts I, II, IV, and VI. (Doc. 60)

II.  <u>Findings of Fact</u>

From 2007 through 2010, R.L. attended Foley Intermediate School (FIS) in Baldwin County, Alabama, for the Fourth, Fifth and Sixth Grades.  FIS is within the jurisdiction of defendant Baldwin County Board of Education.  At that time, FIS transitioned from a Fourth and Fifth Grade intermediate school to a Fifth and Sixth Grade intermediate school.  R.L. was taught by Ms. Stewart in the Fourth Grade, Ms. Prince in the Fifth Grade, and Ms. Manilakis in the Sixth Grade. Defendant Lee Mansell was principal.

The school records indicate that R.L. was classified as white. (Doc. 62-2, R.L.'s Discipline Report indicating his race as "W")  Moreover, Principal Mansell never considered him to be a minority student. (Doc. 62-4, p. 6, Mansell Affidavit)  R.L. is now sixteen years old and in the Eleventh Grade.  R.L. testified that Lampkin, his mother, is white and his father is "black and white".  R.L. considers himself to be white.[3]  (Doc. 62-1, p. 13-14, Deposition of R.L). Lampkin testified that R.L. was white. (Doc. 62-3, p. 12, Deposition of Lampkin)[4] Lampkin also testified that she never thought of R.L. as a minority student. (Doc. 62-3, p. 13)

Baldwin County Board of Education Policy #919, which was in effect at all relevant times, states that the Board of Education shall maintain an on-campus suspension [OCS] program as necessary to provide a structured discipline atmosphere in which students could be isolated or removed from regular classroom activities but is not dismissed from school.  Local school administrators made decisions on implementation of the policy concerning OCS. (Doc. 62-6, p. 2, Affidavit of Alan Lee, Superintendent)

---

[3]  R.L. was asked "What do you consider yourself if you have to check a box on a form?" to which he answered "White." (Doc. 62-1, p. 13)

[4]  Lampkin was asked whether R.L.'s birth certificate indicated that he was white. She responded that he was born in Alabama and was told that race did not have to be on the birth certificate in this state, but "[i]f it has got anything on birth certificate it would be white." (Doc. 62-3, p. 12)

Board Policy #917a, which was in effect at all relevant times, lists the class of student offenses, which are divided into Class I, II and III, and the possible sanctions. OCS was a possible sanction for all categories of student offenses.  Pursuant to the policy, an administrator was allowed to use his or her discretion in determining which sanction should be given.  If parents or students disagreed with the decision of the school administration, the policy provided for a grievance to the Superintendent and then to the Board of Education. (Doc. 62-6, p. 2)

FIS did not have a classroom dedicated to OCS. School staff arranged four study carrels outside of the main office for students' use while in OCS.  (Doc. 62-4, p. 3)  Principal Mansell used her discretion to determine whether R.L. was to be placed in OCS and the location. (Id., p. 5)  R.L. testified that the carrels were "in the lobby" and that "you walk outside the office and walk around the corner and they were against the wall." (Doc. 62-1. p. 17) The carrels were in a hallway and were visible to office staff through a large window in the wall of the main office, as well as through the window in Principal Mansell's office door and the hall camera. The carrels were positioned so that office staff and Principal Mansell could see the students if they stood up or raised their hands. (Doc. 62-4, p. 3-5)

From 2007 through 2010, while R.L. was at FIS, the carrels were painted turquoise instead of black. He never referred to them as black boxes but referred to the carrels as "OCS" or "boxes". (Doc. 62-1, p. 17, 45)

During the 2011 and 2012 school year, the Board discontinued use of the carrels for students assigned to OCS. (Doc. 62-4, p. 5)  The carrels are stored at the Board's warehouse in Bay Minette, Alabama. They are made out of wood, painted a dark color, and measure 30 inches deep, 37.5 inches wide, and 48 inches high. (Doc. 62-7, Affidavit of Walter K. Mason)   The carrels did not have chairs attached. When a student sat in a chair in the carrel, it could not be positioned flush with the wall behind the student. The students could see over the walls when

4

they stood up.  The carrels were light and made of thin wood. They were placed on a tile floor and easily moved.  Students could move them with a single hand. (Doc. 62-1, p. 3-4)  In the summer of 2010, after R.L. was no longer at the school, an assistant principal painted the carrels black because students were writing and drawing pictures on the carrels. (Doc. 62-4, p. 3)

In the Fourth Grade, R.L. was placed in the carrel one time. In the second semester, R.L.'s teacher sent him to the office for "talking back and running around" but did not "write" him up. (Doc. 62-1, p. 18-20)  At the office, he met with either Ms. Stiles[5] or Principal Mansell. R.L. could not recall who told him to sit in the carrel.  He did recall that Ms. Stiles walked with him to the carrel in the hallway and his teacher Ms. Stewart brought his class work to him.  R.L. remained in the carrel for the rest of the school day.  That was the only time he sat in the carrel during the Fourth Grade.  No other students were in the carrels that morning.  However, during the Fourth Grade, he saw other students sitting in the carrels but did not know who they were. (Doc. 62-1, p. 19-24)

In the first semester of the Fifth Grade, R.L's teacher Ms. Prince sent him to the office because he "threw something across the room" which was a "piece of paper" aimed at his friend J.T.  He did not hit J.T.  Principal Mansell was not there.  Ms. Stiles told him to sit in a carrel in the hallway and he chose the one in which to sit.  He did not know if students were sitting in the other carrels.  R.L. sat in the carrel two more times in the Fifth Grade but he does not remember "when" or "what for."  On those two occasions, he does not recall seeing other students in the carrels when he arrived.  Each time his class work was brought to the carrel and he sat in the carrel until the end of the school day.  (Doc. 62-1, p. 25-29)

---

[5] Principal Mansell stated that "[o]ffice staff, including Ms. Stiles had the authority to direct students to sit in the carrels until further action could be taken by an administrator." (Doc. 62-4, p. 5)  She also stated that the carrels were used when students were filling out paperwork or waiting on a parent. (*Id.*).

On one occasion when R.L. was placed in the carrel in the hall, Ms. Stiles brought his lunch to him. On the other days, he either walked with Ms. Stiles to lunch or told her his lunch number and she brought his lunch.  (Doc. 62-1, p. 33-35)  On one occasion, R.L.'s lunch was brought to him late, around 1:30 or 2:00. The lunch hour was typically 11:30 and 1:00. (Doc. 62-1, p. 50)  When he needed to use the restroom, R.L. would either raise his hand or just go to the restroom.  He never urinated or defecated on himself or threw-up while in the carrel. (Doc. 62-1, p. 35-36)

During the second semester of R.L.'s Fifth Grade year, his teacher Ms. Prince placed a carrel in the classroom and from the end of March until the end of the school year in May 2009, R.L. sat in the carrel.  He was the only student in her classroom to sit in a carrel instead of a desk.  He did not speak to anyone about why he was in the carrel.  R.L. worked on his classwork along with the class, except when he did not understand his work.  Sometimes he would raise his hand and ask Ms. Prince about the work he did not understand.  Ms. Prince put his desk in the carrel and pushed it "all the way against the corner and told [R.L.] not to come out."  R.L. did not tell his mother or anyone at school.  When he would get in the carrel, he "would push it off the wall."  (Doc. 62-1. p. 29-33)  He was allowed to move the carrel and did not "get in trouble" if he moved it, but Ms. Prince "just pushed it back if it needed it".  (Doc. 62-1, p. 48)

During this time, R.L. went to lunch, P.E., break unless he had break detention, the library, and art or music class with his classmates. (Doc. 62, p. 29-33)  He never urinated or defecated on himself or threw-up while in the carrel in the classroom. (Doc. 62-1, p. 36)  During this time, R.L. thought that Principal Mansell walked in the classroom "once or twice to talk to Ms. Prince." (Doc. 62-1, p. 48)

Ms. Prince was employed as an Intervention Teacher for the Fifth and Sixth Grade students at FIS.  During the 2008-2009 school year, she had "difficulties" with R.L. "not

focusing or staying in his seat."  In the spring, Ms. Prince met with Lampkin to discuss strategies

to help R.L. focus.  They discussed placing R.L. at a carrel instead of a desk, which was a

strategy Ms. Prince had used successfully in the past with other students.  Ms. Prince believed

that Lampkin agreed to this strategy and after the meeting, the carrel was moved into the

classroom. Ms. Prince could see R.L.'s hand when raised and R.L. could see the blackboard from

the carrel. Ms. Prince never prohibited R.L. from leaving the classroom to go to the restroom,

lunch, music, art, or P.E.  Ms. Prince believed that sitting in the carrel was a successful strategy

for re-focusing R.L. on his class work.  R.L. passed the Fifth Grade. (Doc. 62-5, Prince

Affidavit).  R.L. did not receive any counseling or medical treatment after he was placed in the

carrel. (Doc. 62-1, p. 43-44)

R.L. does not remember any occasion during the Sixth Grade when he was placed in the

carrel. (Doc.62-1, p. 29).

FIS staff also used an unoccupied office in the library as extra space for students in OCS.

FIS had a librarian and an aide in the library during the day. (Doc. 62-4, p. 4)  The office had a

window in the door, a desk-chair combination, and measured 11'7" in length and 8'8" in width.

(Id., p. 4; Doc. 62-8, Affidavit of Becky Comer, Assistant Superintendent for Elementary and

Intermediate Schools)

R.L. testified that the office was "like a little storage room", a "little closet", that was

behind the library desk. There were books, posters and a desk with a chair attached.  The door

did not have a window.[6]  On one occasion, during the Fourth Grade, he was in the carrel in the

---

[6] There is a dispute of fact as to whether the office/closet had a window.  At the summary
judgment stage, all material disputes of fact are resolved in favor of the non-movant.  *McDowell
v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004) (the court must "resolve all issues of material
fact in favor of the [non-movant]").  However, for purposes of this motion, the presence or
absence of a window is not material.

hallway when the librarian came and got him, told him to bring his book-bag and class work with him, and placed him in the "little closet" in the library.  On this day, other students including his classmates were at a book fair in the library.  They made faces at him and the librarian closed the door.  (Doc. 62-1. p. 37-40)  The door was "always unlocked from the inside" and R.L. could leave whenever he wanted.[7]  He opened the door at the end of the school day because the room got hot. (Doc. 62-1, p. 49-50)  This was the only time that R.L. was placed in the office/closet. He did not receive any counseling or medical treatment after he was placed in the office/closet. He was never placed in the office/closet in the Fifth Grade or Sixth Grade. (Doc. 62-1, p. 42-44)

Lampkin admitted under oath that she has no knowledge whether minority students were disciplined more frequently than non-minority students. (Doc. 62-3, p. 6, Lampkin deposition) She also admitted that she has no knowledge of any one treating R.L. differently than any other student. (Doc. 62-3, p. 58)  R.L. observed that minority students were treated the same as non-minority students "Sometimes. Most of the time." (Doc.  62-1, p. 46-47)  Principal Mansell stated that race was not considered in the administration of discipline or placement in OCS at FIS and students of all races were disciplined and placed in OCS (Doc. 62-4, p. 3)

III. Conclusions of Law

A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (Dec. 2010). Rule 56(c) provides as follows:

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

---

[7] In the response, Lampkin argues that R.L. and another student were placed in the "locked closet." (Doc. 67, p. 8)  Since there is no evidence regarding this issue other than R.L.'s sworn testimony, his testimony is evidence that the office/closet was not locked.

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.

(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. Rule 56(c) (Dec. 201).

Defendants, as the parties seeking summary judgment bear "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986)).

Once Defendants satisfy this responsibility, the burden shifts to Lampkin, as the non-movant, to show the existence of a genuine issue of material fact. *Id*. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter. Instead, the evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen,* 965 F.2d 994, 999 (11th Cir. 1992) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505 (1986)); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-159, 90 S. Ct. 1598, 1608-1609 (1970).

However, "[a] moving party is entitled to summary judgment if the nonmoving party has 'failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *In re Walker*, 48 F. 3d 1161, 1163 (11th Cir. 1995) (quoting *Celotex Corp.*, 477 U.S. at 323, 106 S. Ct. at 2552). Overall, the court must "resolve all issues of material fact in favor of the [non-movant], and then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts." *McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004) (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003)).

Moreover, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).  "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (citation omitted).

B. <u>Analysis</u>

1. <u>Counts 1, IV, and VI</u>

In Count I, Lampkin alleges that the Baldwin County Board of Education, a recipient of financial assistance from the United States Department of Education, violated Title VI of the Civil Rights Act of 1964. Lampkin alleges that white students were not subjected to the same

treatment and punishment for similar misconduct as were students of color, such as R.L. who is bi-racial.

The Board argues that it is entitled to judgment in its favor as to Count I on basis that R.L. is not a student of color, but instead is considered white. Alternatively, the Board argues that even if R.L. was a student of color, Lampkin has no evidence that R.L. was disciplined more than non-minority students.

In Count IV, brought pursuant to 42 U.S.C. § 1983, Lampkin claims that the Board and the individual defendants in their individual capacities violated "R.L.'s Fourth and Fourteenth Amendment rights by the use of excessive discipline and corporal punishment."  (Doc. 51, p. 12) Lampkin alleges that placing R.L., "a bi-racial student", in the 'black box" and "locked closet" in "isolation from the classroom and academic environment was extreme and inhumane" and "was fashioned … to punish, humiliate and intimidate R.L." and subject him to ridicule and embarrassment.  Lampkin alleges that "[w]hile R.L.'s teacher taught and instructed fellow students in his classroom, his teacher prohibited R.L. from observing the blackboard as well as refused to instruct R.L. academically." (Id.)

The Board argues that there is no evidence of a policy, custom, or practice of discriminating against students based on their race in administering discipline. The individual Defendants argue that R.L.'s substantive due process rights to an education under the Fourteenth Amendment were not violated by his placement.  They point out that Lampkin has not "shown that students of a different race were placed in a different setting when they had OCS." (Doc. 61, p. 11)  They also point out that the stated purpose of OCS was to "provide a structured discipline atmosphere in which a student is isolated or removed from regular classroom activities but is not dismissed from the school setting." (Doc. 61, p. 12) The individual Defendants also argue that placing R.L. in OCS does not rise to the level of a violation of the Fourth or Fourteenth

Amendments based on excessive discipline or corporal punishment.  Alternatively, they argue

that they are entitled to qualified immunity and the protection of the federal statutory immunity

under the *No Child Left Behind Act*, 20 U.S.C. § 6731.

In Count VI, Lampkin alleges a state law claim of false imprisonment against the

individual defendants – Principal Mansell, Superintendent Lee, and the Board members - in their

individual capacity.  Lampkin alleges that placing R.L. in the "black box" and the "locked

closet" in the library constituted false imprisonment.  The individual Defendants argue that they

are entitled to State-agent immunity under *Ex parte Cranman,* 792 So. 2d 392 (Ala. 2000), which

restates the rules governing immunity of state agents from tort liability.

Review of Lampkin's response shows that she did not address Defendants' arguments as

to Counts I, IV and VI.   Instead, Lampkin responded to the Defendants' argument that R.L.'s

right to Equal Protection under the Fourteenth Amendment had not been violated. Therefore,

Lampkin is deemed to have abandoned the claims in these counts.  Accordingly, summary

judgment is granted in favor of Defendants as to Counts I, IV and VI. *See Cusick v. Yellowbook,*

*Inc.*, 2015 WL 1759480, *1 n.1 (11th Cir.  Apr. 20, 2015) ("Cusick also raised claims for

association discrimination under the ADA based upon his termination and for retaliation.

However, he did not address these claims in his response to Yellowbook's motion for summary

judgment, and the district court properly deemed them abandoned.") (citing *Resolution Trust*

*Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995) for its "holding that 'grounds alleged

in the complaint but not relied upon in summary judgment are deemed abandoned.'"); *Wilkerson*

*v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned, and affirming

grant of summary judgment, as to claim presented in complaint but not raised in initial response

to motion for summary judgment); *Coalition for the Abolition of Marijuana Prohibition v. City*

*of Atlanta*, 219 F.3d 1301, 1325 (11th Cir. 2000) (finding claim abandoned where it was not

briefed and argued in district court in party's response to motion for summary judgment or in party's own motion for summary judgment); *see also Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 892 (11th Cir.1999) (affirming "the unremarkable position that assertions made in the pleadings (*e.g.*, complaint or answer), but not made in opposition to a motion for summary judgment, need not be considered by the district court or the appellate court in ruling on the motion for summary judgment"); *Resolution Trust Corp.*, 43 F.3d 587 at 599 ("In opposing a motion for summary judgment, 'a party may not rely on his pleadings to avoid judgment against him.' There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Morton v. Automobile Ins. Co. of Hartford, Conn.*, 2015 WL 1586092, *13 (N.D. Ala., Apr. 9, 2015) (deeming plaintiff to have abandoned her claim for personal property coverage because she did not address defendant's argument that the insurance policy did not provide coverage for personal property and granting summary judgment in favor of defendants on this aspect of plaintiff's breach of contract claim).

    2. Claim for Injunctive Relief

    Lampkin also included a claim for injunctive relief to enjoin the Defendants from using the "black box" and "locked closets" for punishment.  (Doc. 51, Prayer for Relief)  On motion for summary judgment, Defendants argue that the claim for injunctive relief is moot.  Defendants provide evidence that R.L. no longer attends FIS, Defendants Superintendent Lee and Principal Mansell have retired, the Board stopped the use of the carrels in the 2011-2012 school term, and that the unoccupied office in the library was only used as extra space for OCS during the 2008 and 2009 school year.

Lampkin did not address this argument in her response and therefore, did not provide any evidence that the Defendants continue to use the "black box" or "locked closet" at FIS. Accordingly, Lampkin's claim for injunctive relief is moot and summary judgment is granted in favor of the Defendants as to that claim.

3. Count II

In Count II, brought pursuant to 42 U.S.C. § 1983, Lampkin alleges that R.L. was discriminated against on basis of race in violation of the Equal Protection Clause because he was placed "repeatedly in the 'black box'" or "locked closets" but Defendants did not place "white students in similar circumstances (i.e. alleged excessive talking, failure to complete homework or classwork, or other minor disciplinary infractions) inside of a black box or . . . locked closets also." (Doc. 51, p. 10)  Lampkin alleges that the individual Defendants in their individual capacity and the Board "approved or ratified the unlawful, deliberate, malicious, reckless, and/or wanton conduct" and discriminated on basis of race. (Id. p. 10-11)

In the motion for summary judgment, Defendants argue that the evidence fails to prove any action or inaction, which rises to the level of a constitutional violation.  Defendants point out that R.L. testified that he was placed in the carrel outside the main office only four times during the Fourth and Fifth Grades, that he was placed in the "closet"[8] in the library on one occasion during the Fourth Grade, and that he was not placed in OCS during the Sixth Grade.  Defendants point out that R.L.'s disciplinary record does not reflect any of these placements in OCS, but reflect nine other incidents that resulted in different discipline, and thus, two-thirds of the times that he was disciplined, he was not placed in OCS. The parties do not dispute that R.L. was placed in a carrel in the classroom during the last three months of his Fifth Grade year.

---

[8]  Although Lampkin refers to the closet as a "locked closet", R.L. testified that it was not locked.

Defendants also argue that Lampkin has no evidence that non-minority students were disciplined in a different manner than the discipline administered to R.L.  They argue that race is never considered when administering discipline or determining whether to place a student in OCS. Defendants also argue that R.L., Lampkin, and Principal Mansell did not consider R.L. to be a minority student and that race was not considered when placing R.L in OCS.  The individual Defendants also assert the defense of qualified immunity.

In response, Lampkin argues that "Defendant Lee Mansell violated R.L.'s federally protected constitutional rights and is liable under 42 U.S.C. § 1983". (Doc. 67, p. 2)  Lampkin explains that the "Court's inquiry is whether R.L. had a 'clearly established' right to be punished equally as or educated equally as his white classmates and whether the acts by Lee Mansell violated 'clearly established' law." (Id., p. 3)  Lampkin argues that a reasonable jury could infer violations of R.L.'s right to Equal Protection when he was placed in the "black box" in the hallway and in the classroom and when he was placed in the "locked closet "on basis of his race.

In their reply, Defendants point out that Lampkin limits her response to whether Principal Mansell violated R.L.'s constitutional rights under the Equal Protection Clause and fails to argue that any of the other Defendants violated R.L.'s constitutional rights.  The Court has reviewed Lampkin's response and finds that while she mentions the Defendants, she has limited her argument to her claim against Principal Mansell in her individual capacity for violation of the Equal Protection Clause.  Therefore, Lampkin has abandoned the remaining Equal Protection claims against the individual Board Members, Superintendent Lee, and the Board. Accordingly, summary judgment is granted in their favor as to Lampkin's claim of violation of the Equal Protection Clause.  *See Cusick,* 2015 WL 1759480, at *1 n.1; *Wilkerson,* 270 F.3d at 1322; *Coalition for the Abolition of Marijuana Prohibition,* 219 F.3d at1325; *Brasseler, U.S.A. I, L.P.,* 182 F.3d at 892; *Resolution Trust Corp.,* 43 F.3d at 599; *Morton,* 2015 WL 1586092, at *13.

The Court next addresses the remaining claim against Principal Mansell.  Lampkin brings this Equal Protection claim pursuant to 42 U.S.C. § 1983, which provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

To state a claim under 42 U.S.C. § 1983, Lampkin must allege the deprivation of a right secured by the Constitution or federal laws and must show that the alleged deprivation was committed by a person acting under color of state law. *See Bingham v. Thomas,* 654 F.3d 1171, 1175 (11th Cir. 2011).  The parties do not dispute that Principal Mansell was acting under color of state law.  *Id.*

Principal Mansell argues that she is entitled to qualified immunity on Lampkin's claim that R.L.'s right to Equal Protection has been violated.  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Keating v. City of Miami,* 598 F.3d 753, 762 (11th Cir. 2013); *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir. 2002); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  A school principal, as a government official sued pursuant to § 1983, may seek judgment on basis that she is entitled to qualified immunity.  *C.C. ex rel. Andrews v. Monroe County Bd. of Educ.,* 427 Fed. Appx. 781 (11th Cir. 2011); *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1263 (11th Cir. 2004); *McShea v. School Bd. of Collier County, Fla.,* - - - F. Supp. - - -, 2014 WL 5590816, *12-13 (M.D. Fla. Nov. 3, 2014).

Under the qualified immunity analysis, Principal Mansell must first prove that "the allegedly unconstitutional conduct occurred while [she] was acting within the scope of [her] discretionary authority." *C.C. ex rel. Andrews,* 427 Fed. Appx. at 782; *Crosby v. Monroe County*, 394 F.3d 1328, 1331 (11th Cir. 2004). The parties do not dispute that Principal Mansell was exercising her discretionary authority when she made the decision to place R.L. in OCS, supervised staff who placed R.L. in OCS, or supervised the teacher who placed R.L. in the carrel in the classroom.

The burden then shifts to Lampkin to prove that Principal Mansell's "conduct violated clearly established law." *C.C. ex rel. Andrews,* 427 Fed. Appx. at 782. "As the Supreme Court noted, '[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.'" *C.C. ex rel. Andrews,* 427 Fed. Appx. at 782-783 (quoting *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793 (1991)). If Lampkin proves that a constitutional violation occurred and that the constitutional right was clearly established, then Principal Mansell is not entitled to qualified immunity. The "district court has discretion to determine in what order to address each part" of the qualified immunity analysis. *Keating*, 598 F. 3d at 762, citing *Pearson v. Callahan*, 555 U.S. 223, 129 S Ct. 808, 820 (2009).

The Court looks first to whether the facts and evidence, viewed in the light most favorable to the non-movant Lampkin, establish a violation of the Equal Protection Clause. The Clause prohibits a state from denying to "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XVI, § 1. The Equal Protection Clause "requires government entities to treat similarly situated people alike." *Rollins v. Bd. of Trustees of the University of*

17

*Alabama*, 2014 WL 4829540, *17 (N.D. Ala. Sept. 29, 2014) (quoting *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313 (11th Cir. 2006)).

In a disparate treatment case based on circumstantial evidence, the courts apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973). *Farmer v. Board of Regents of University System of Georgia*, 589 Fed. Appx. 913, 917, n.3 (11th Cir. 2014) (applying the *McDonnell Douglas* framework to the Equal Protection claims of students who were offered but then denied football scholarships). To establish an Equal Protection claim, Lampkin must show that R.L. "was treated differently from other, similarly situated individuals, and [] the defendants unequally applied [school policy] for the purpose of discriminating against [R.L.]." *Roy v. Fulton County School Dist.*, 288 Fed.Appx. 686, 688 (11th Cir. 2008) (alleging that M.R. was treated differently on basis of race when he was suspended while a white student involved in the same incident was not suspended) (citing *GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367 (11th Cir.1998); *accord Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir.2006)). "To be similarly situated, the comparators must be prima facie identical in all relevant aspects." *Grider v. City of Auburn, Ala.,* 618 F. 3d 1240, 1264 (11th Cir. 2010).

Accepting for purpose summary judgment that R.L. is bi-racial as identified in the fourth amended complaint, Lampkin has not identified any similarly situated non-minority comparators who are prima facie identical to R.L. in all relevant aspects that were treated differently than R.L. Lampkin argues that R.L. was "subjected to more severe and humiliating punishment of being placed in the 'black box' (which was backed against the wall to create a fully enclosed fourth corner) than his fellow white students who committed the same infractions that he committed." (Doc. 67, p. 5) Lampkin also argues that "R.L. was put in the 'black box' for approximately

three months while his fellow white students who committed the same offenses[9] as he did received better treatment by going unpunished and being allowed to remain in the classroom." (Doc. 67, p. 6)  Discovery has now closed, but Lampkin has not identified these "fellow white students" and provided evidence that they, in fact, were "prima facie identical in all relevant aspects", *i.e.*, committed "nearly identical" offenses and were disciplined or educated in a more favorable manner.  *See Davis v. Houston County, Al. Bd. Of Educ*., 291 Fed. Appx. 251, 252, (11th Cir. 2008). ("In order for another student to be similarly situated to Joshua Davis, plaintiff must show that the students are 'prima facie identical in all relevant respects.' . . . Two individuals are 'similarly situated' if the quantity and quality of the comparator's misconduct is 'nearly identical' to the individual raising the discrimination claim.") (citations omitted); *Roy*, 288 Fed. Appx. at 688  (". . .  it is clear that Mark and J.B. were not similarly situated, and as a result, the Roys have not established the necessary elements of an equal protection violation. The district court therefore did not err in dismissing this claim."); *K.W. v. Lee County School Bd*., 2014 WL 7014532, 7 (M.D. Fla. Dec. 11, 2014)  ("Here, plaintiff alleges that Swope and Patti singled out J.W. 'for disparate treatment different from the other minor children at Allen Park Elementary School.' [ ] There are, however, no allegations suggesting that the 'other minor children at Allen Park Elementary School' were similarly situated in all relevant respects. Plaintiff must do more than assert that other, unidentified students, were given better treatment.") (addressing a class-of-one Equal Protection claim involving disabled student).

The affidavits Lampkin submitted in support of her response do not provide relevant evidence of a substantially similar non-minority student who was treated differently than R.L.,

---

[9]  The undisputed statement of Ms. Prince, R.L.'s Intervention Teacher, indicated that R.L. was placed in the carrel in the classroom so that he would focus on his classwork and not for punishment or discipline for an offense or infraction.  Ms. Prince stated that sitting in the carrel was a successful strategy for re-focusing R.L. on his class work and that R.L. passed the Fifth Grade. (Doc. 62-5, Prince Affidavit).

and therefore, the Court did not rely upon the information contained in the affidavits.  The Court

acknowledges that the affidavits do not comply with Fed. R. Civ. P. 56(c)(4).[10] However,

assuming that Jerome Bodiford and Alec Barnett, Jr.'s statements - that non-minority students

involved in a cheating incident were not placed in the carrel while N.B. and R.P., their minority

students, were placed in the carrel  -  could be reduced to admissible form for trial, N.B. and R.P.

were not students at FIS during the same time period as R.L. (Docs. 70-3; 40-4)  N.B. was a

student at FIS during the 2011-2012 term. (Doc. 72-2, Mansell Affidavit)   R.P. was a student at

FIS during the 2011-2012 and part of the 2012-2013 term. (Id.)  R.L. left FIS at the end of the

2010 term. (Id.)  Moreover, that non-minority students may have been treated differently when

they were involved in a cheating incident has no relevance to Lampkin's allegations regarding

R.L.'s placement in the carrel and "locked closet". R.L.'s placement was based on substantially

dissimilar conduct.  Accordingly, Lampkin has failed to establish a prima facie case.

    Because Lampkin has not met her burden to establish an Equal Protection Claim, *i.e.*, a

constitutional violation,[11] Principal Mansell is entitled to qualified immunity. *Siegert v. Gilley*,

500 U.S. 226, 232 (1991) (where a plaintiff fails to allege "a violation of a constitutional right at

all," that right is not clearly established for purposes of qualified immunity.) *Cottone v. Jenne*,

326 F.3d 1352, 1362 (11th Cir. 2003) (if the plaintiff fails to allege a constitutional violation, the

---

[10] The Rule provides as follows: "(4) Affidavits or Declarations. An affidavit or declaration used
to support or oppose a motion must be made on personal knowledge, set out facts that would be
admissible in evidence, and show that the affiant or declarant is competent to testify on the
matters stated."  Fed. R. Civ. P. 56(c)(4).

[11]   To the extent that Lampkin attempts to impose supervisory official liability on Principal
Mansell, she must establish that Principal Mansell "personally participate[d] in the alleged
constitutional violation or there is a causal connection between the actions of the supervising
official and the alleged constitutional deprivation." *Doe v. School Bd. of Broward County, Fla.,*
604 F. 3d 1248, 1263 (11th Cir. 2010).   However, since Lampkin has failed to make a sufficient
showing of a constitutional violation, the Court need not address whether Principal Mansell
personally participated or whether there was a causal connection.

court need not reach the "clearly established law" prong of the qualified immunity analysis).

Accordingly, summary judgment is granted in favor of Principal Mansell. *In re Walker*, 48 F. 3d

at 1163 ("A moving party is entitled to summary judgment if the nonmoving party has 'failed to

make a sufficient showing on an essential element of her case with respect to which she has the

burden of proof.'").[12]

IV.  Conclusion

Upon consideration of the evidence and for the reasons set forth herein, Defendants'

motion for summary judgment is granted.

DONE and ORDERED this 9th day of June 2015.

  s / Kristi K DuBose
KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE

---

[12] The Court notes that "plaintiffs alleging discrimination can present circumstantial evidence to
defeat summary judgment without satisfying the *McDonnell Douglas* framework or relying on its
presumptions."  *Farmer*, 589 Fed. Appx. at 917, n.3 (citing *Smith v. Lockheed–Martin Corp.*,
644 F.3d 1321, 1328 (11th Cir.2011).  However, even viewing the evidence in the light most
favorable to Lampkin, she has not presented a "convincing mosaic of circumstantial evidence
that would allow a jury to infer intentional discrimination" by Principal Mansell. *Smith,* 644 F.
3d at 1328.